# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **BASIC MEDICAL CARE PLUS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:03CV00269** |
| | ) | |
| **NORTH CAROLINA MUTUAL LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

**SHARP, Magistrate Judge**

This matter comes before the Court on (1) a motion by Defendant North Carolina Mutual Life Insurance Company ("NC Mutual") for summary judgment and for partial summary judgment (Pleading No. 23); and (2) a cross-motion by Plaintiff Basic Medical Care Plus, Inc. ("Basic Medical") for partial summary judgment (Pleading No. 25). The motions have been fully briefed, and the parties have been heard in oral argument. The motions are ready for a ruling.

### I.  Procedural History

On March 25, 2003, Plaintiff Basic Medical filed a complaint in this Court seeking damages against Defendant NC Mutual for breach of contract and unfair or deceptive trade practices in connection with the development of an insurance product called Basic Medical

Care Plus. On May 30, 2003, Defendant NC Mutual filed an answer denying the material allegations in Plaintiff's complaint and asserting counterclaims of breach of contract, unfair or deceptive trade practices, and abuse of process against Plaintiff. Plaintiff filed a reply to the counterclaims on June 17, 2003. After a period of discovery, Defendant NC Mutual filed a motion for summary judgment and partial summary judgment, requesting the Court to grant summary judgment in its favor on its breach of contract and unfair or deceptive trade practices counterclaims and to dismiss all of Plaintiff's claims with prejudice. In turn, Plaintiff Basic Medical filed a cross-motion for partial summary judgment, urging the Court to grant summary judgment in Plaintiff's favor on its breach of contract claim and to dismiss all of Defendant's counterclaims with prejudice.

## II. Statement of Facts

In May 1995, Henry "Hank" J. Miller ("Miller"), a resident of Tennessee and former insurance sales agent for the American Family Life Assurance Company ("AFLAC"), purchased a property and casualty insurance company called Vol-State Agency, Inc. ("Vol-State"). He has owned and operated the business since that time. (Pleading No. 26, Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 1, Henry J. Miller Dep. at 9-11, 68, 79, 83.) In 1997, Miller began researching the creation of a new insurance product (the "Product") which would provide affordable, basic health insurance benefits to employees of small business owners who would not otherwise offer health coverage. *Id.* at 85, 97-98.

In April or May 2000, Miller solicited a consultant to assist him in finding an insurance company to underwrite the Product. *Id.* at 102-07, 110-12. The consultant introduced Miller to James Parrish, who was at that time the Executive Vice President of Defendant NC Mutual, a life insurance company headquartered in Durham, North Carolina. *Id.* at 111; Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 2, James N. Parrish Dep. at 67. On September 20, 2000, Miller met with Parrish about the Product, and Parrish became Miller's contact person at NC Mutual regarding the Product. (Miller Dep. at 111; Parrish Dep. at 67, 76-77; Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 3.)

Although NC Mutual had done very limited business in the field of health insurance, Miller persuaded representatives of NC Mutual that the Product could succeed, forecasting $25 million in sales within five years. (Pleading No. 34, Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. L, Charles D. Watts, Jr. Dep. at 64; Ex. J, Henry J. Miller Dep. (Def.)[1] at 85, 137-38.) On or about November 3, 2000, Parrish called Miller to advise him that NC Mutual was "prepared to go forward" in bringing the Product to market. (Parrish Dep. at 90-95.) Miller sent Parrish a letter that same day to confirm the substance of their telephone conversation. (Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 5.)

On approximately November 15, 2000, in anticipation of his retirement from NC Mutual, Parrish entered into an agreement with NC Mutual in which he agreed as follows:

---

[1] The Court will cite to the portions of depositions attached to Plaintiff's briefs as, e.g., "Miller Dep. at 10." Citations to the portions of depositions attached to Defendant's briefs will appear as, e.g., "Miller Dep. (Def.) at 10."

> Basic Medical Care Plus Plan: CONSULTANT shall develop a new product in the basic medical care area by July 1, 2001, for which he shall take the steps necessary to launch the product, provide the necessary management and operating services for the product as a self-contained unit including policy filing and follow-up, any licensing follow-up, daily operations, interfacing with the managing general agent and the third party administrator for that product, preparation of accounting entries and any other aspects of this product that the CONSULTANT and the COMPANY agree upon.

(Parrish Dep. at 97, 106, 108; Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 6 at 2.) In late 2000 and early 2001, Parrish worked with the Actuarial Resources Corporation to develop and price an appropriate premium structure for the Product. (Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Exs. 9-12.) On February 21, 2001, Miller and Parrish discussed the status of the Product and the terms of the Marketing Agreement to be signed by the parties. (Parrish Dep. at 148-51; Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 13.) At the end of February 2001, Parrish retired from NC Mutual and continued to work on the Product pursuant to the terms of his Consultant Agreement. (Parrish Dep. at 100, 123-24.) On March 6, 2001, Parrish certified an Actuarial Memorandum for the Product, and on March 12, 2001, NC Mutual filed the necessary paperwork with the North Carolina Department of Insurance to ensure that the Product was approved for sale in North Carolina. (Parrish Dep. at 152; Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 14; Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. E.)

On March 15, 2001, Miller sent a letter to Parrish asking for the status of the Marketing Agreement. (Parrish Dep. at 153-56; Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 15.) Meanwhile, in March or April 2001, Miller incorporated and became president

-4-

of Basic Medical Care Plus, Inc., a Tennessee corporation formed to market the Product in North Carolina and Tennessee. (Miller Dep. (Def.) at 112-13, 124-25, 148.) On May 16, 2001, Parrish faxed Miller a proposed Marketing Agreement, and Miller responded with his own suggestions about the agreement's terms. (Parrish Dep. at 157; Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 16.) On July 17, 2001, the North Carolina Department of Insurance approved the Product for sale in North Carolina. (Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. E at 191.) At approximately the same time, the Product was also approved for sale in Tennessee. (Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. Q, Goldie Evans Dep. at 27.)

On July 18, 2001, Miller traveled from Tennessee to Durham to meet with representatives of NC Mutual to finalize the terms of the Marketing Agreement. Parrish had prepared a memorandum informing several of NC Mutual's representatives of the meeting with Miller. (Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 19.) When Miller arrived in Durham, however, he was told that the President of NC Mutual, Bert Collins, was not available, and that the Marketing Agreement would have to be signed at a later date. (Pleading No. 1, Compl. ¶ 18.)

Shortly thereafter, Parrish learned that certain representatives of NC Mutual were becoming reluctant to finalize the agreement that had been reached orally between Miller and Parrish. In a memorandum dated July 20, 2001, Parrish wrote to Collins as follows:

> I was surprised to learn that you are now having reservations about this product. While still serving as Executive Vice President of NCM and at your

urging, I worked with Hank Miller to bring this product to fruition as a source of new revenue for NCM. I made verbal commitments on several occasions that NCM wan[t]ed to move forward with the project. When Hank wanted to have NCM's commitment in writing, I developed a Marketing Agreement, . . . had it reviewed by Counsel, negotiated it with Hank Miller and commit[t]ed to it verbally. I hope that you will go ahead and sign the agreement immediately.

. . .

As you know, I was never a proponent of health insurance but I feel good about the potential success of this venture.

. . .

 . . . Because of the urgency that you felt for new premium sources, I pursued this project and recommend that you continue with it.

(Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 20.) Parrish followed up the July 20, 2001 memorandum with a July 28, 2001 letter to Chuck Watts, Senior Vice President and General Counsel for NC Mutual, which provided as follows:

I do not agree with top management's refusal to sign the Marketing Agreement as negotiated in good faith with Miller. I believe that it is a mistake to take the steps that you are planning and do not wish to be associated with these efforts in any way. If the company does incur some liability as a result of the willful and intentional acts associated with [the] failure to continue with the project as agreed to with Hank Miller, please be advised that I would consider Section XII of the Consulting Agreement applicable and any monetary loss that I might suffer as a result of being drawn into the ill-advised course of action that top management has chosen will be borne by the Company.

Please notify Hank Miller that I am no longer associated with this project on Monday.

*Id.*, Ex. 21.

Notwithstanding these areas of conflict, Collins and Miller finally executed the Marketing Agreement in late September 2001.[2] *Id.*, Ex. 23. The Marketing Agreement named Basic Medical as NC Mutual's exclusive marketing agent for the Product in North Carolina and Tennessee, and NC Mutual agreed to pay Basic Medical and its sales agents a commission for every policy of the Product sold in those states. *Id.* ¶¶ 1.1, 3.1. In return, the Marketing Agreement required Basic Medical to achieve the following yearly minimum premium sales levels:

| | |
|---|---|
| 2002 | $1,000,000 |
| 2003 | $1,500,000 |
| 2004 | $2,000,000 |
| 2005 | $2,500,000 |
| Any year after 2005 | $3,000,000 |

*Id.* ¶ 3.2. The Marketing Agreement further provided that it could be terminated, among other reasons, (1) upon ninety days' written notice by either party if the agreement's minimum premium sales levels were not met; or (2) by NC Mutual upon NC Mutual's withdrawal of the Product from the market, provided that NC Mutual did not then market the Product anywhere in the United States during the following year. *Id.* ¶¶ 4.2, 5.1.1, 5.1.2.

---

[2] Although the Marketing Agreement was signed by the parties some time in late September 2001, the agreement contained an effective date of April 1, 2001. The record provides no explanation for this discrepancy. (Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 23.)

After the execution of the Marketing Agreement, Miller worked towards fulfilling Basic Medical's contractual obligations by securing investors, recruiting agents and investing his own money. (Miller Dep. at 148, 160-68.) However, Miller was not able to devote a significant amount of time to these tasks in January, February, and March 2002, because his other company, Vol-State, was burdened with sharply increasing business demands following a change in Tennessee's insurance laws in January 2002. (Miller Dep. at 167-68; Pleading No. 37, Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. and Partial Summ. J., Ex. 27, Henry J. Miller Aff. ¶ 3; Miller Dep. (Def.) at 192; Pleading No. 31, Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., Ex. M, Miller Dep. Vol. II (Def.) at 60-61.) Also during this time, NC Mutual was undergoing a strategic planning process and examining its business organization and executive structure in anticipation of the retirement of Bert Collins and James Parrish. (Watts Dep. at 6-7.) As part of this process, NC Mutual reevaluated its decision to offer health insurance policies for sale, including the Product. As a result, NC Mutual carefully monitored Basic Medical's performance under the Marketing Agreement. (Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. H, resp. to interrog. no. 5.)

On March 7, 2002, Watts called Miller and informed him that NC Mutual was dissatisfied with the progress that Miller had made towards the 2002 minimum premium

sales requirement of $1,000,000.[3] (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., Ex.

A, Charles D. Watts, Jr. Aff. ¶ 14; Miller Dep. (Def.) at 204)  On March 11, 2002, Miller

received a fax from Watts which provided in relevant part as follows:

> Pursuant to our conversation last week, it appears to us, given the performance of the first quarter of this year, that there is very little chance that you would be able to meet the sales targets that are established in our agreement dated April 1, 2001, as amended.  Under paragraph 5.1.1 either party may terminate the agreement "upon ninety (90) days prior written notice to the other if or when production requirements . . . are not met."  While the production amounts are stated as annual goals, we believe that nothing in the agreement precludes our interpolating them into quarterly goals.  Thus, since we believe that you will not have made any material progress toward to [sic] meeting [the] one quarter of the million dollar annual target by March 31, 2002, we are giving notice of termination to be effective June 1, 2002.
>
> . . . [W]e will continue to support you in any way that we can and if your performance begins to approach targeted levels before June 1, 2002 nothing could make us happier than to rescind this letter of termination.

(Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 26.)  Miller did not agree with Watts that

the Marketing Agreement gave NC Mutual the right to "interpolate" the annual premium

---

[3] The parties dispute the contents of the remainder of their conversation on March 7, 2002.  Miller maintains that he advised Watts of the business demands on Vol-State and his temporary inability to devote more time to development of the Product.  (Miller Aff. ¶ 3; Miller Dep. at 168; Miller Dep. (Def.) at 192, 196; Miller Dep. Vol. II (Def.) at 63.)  Watts denies that Miller mentioned this time commitment to Vol-State in any fashion.  (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., Ex. O, Charles D. Watts, Jr. Dep. Vol. II at 15.)

goals into quarterly goals.[4]  (Miller Aff. ¶ 5; Miller Dep. (Def.) at 196, 198, 204.)  Miller felt

that it "would have been inappropriate and irresponsible to continue to hire a sales force in

light of the notice of termination." (Miller Aff. ¶ 7.)  Accordingly, Miller interpreted Watts'

March 11th letter as a termination of the Marketing Agreement and held a meeting with his

board of directors, which voted to cease all operations immediately.  *Id.* ¶ 4; Pl.'s Br. in

Supp. of Mot. for Partial Summ. J., Ex. 25; Miller Dep. (Def.) at 152.).

    Following the board's decision to cease all operations of Basic Medical, Miller took

no further actions to market the Product or a similar health insurance policy to any other

insurance companies.  (Miller Dep. (Def.) at 205-08; Miller Dep. Vol. II (Def.) at 32-33.)

### III.  Summary Judgment Standard of Review

    The summary judgment standard of review under Rule 56 of the Federal Rules of

Civil Procedure is well established.  A party is entitled to judgment as a matter of law upon

a showing that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  The

material facts are those identified by controlling law as essential elements of claims asserted

by the parties.  A genuine issue as to such facts exists if the evidence forecast is sufficient

for a reasonable trier of fact to find for the nonmoving party.  *Anderson v. Liberty Lobby,*

---

[4] The parties disagree whether Miller attempted to contact Watts about the March 11th
letter.  Miller maintains that he attempted to call an NC Mutual representative, Art Davis, and
Watts at least twice, leaving messages that were not returned.  (Miller Aff. ¶ 6; Miller Dep.
(Def.) at 152, 188-89, 204; Miller Dep. Vol. II (Def.) at 28.)  Watts maintains that he always
returns his calls, and that if Miller had called him, he would have been informed of the call
and returned it.  (Watts Dep. Vol. II at 14.)

*Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In evaluating a forecast of evidence on summary judgment review, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

When the moving party has carried its burden, the nonmoving party must come forward with evidence showing more than some "metaphysical doubt" that genuine and material factual issues exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), *cert. denied,* 481 U.S. 1029 (1987). A mere scintilla of evidence is insufficient to circumvent summary judgment. *Anderson*, 477 U.S. at 252. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Id*. at 248-49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

## IV. Discussion

A. <u>The Breach of Contract Claims</u>

Basic Medical moves for summary judgment on its breach of contract claim on the ground that NC Mutual's March 11th notice of termination constituted an anticipatory breach of the Marketing Agreement, citing *Pitts v. Broyhill*, 88 N.C. App. 651, 364 S.E.2d 738

-11-

(1988) and *Tillis v. Calvine Cotton Mills, Inc.*, 251 N.C. 359, 111 S.E.2d 606 (1959). Basic Medical argues that NC Mutual's "interpolation" of the annual premium sales requirements into quarterly requirements was not supported by the "plain meaning" of the Marketing Agreement, and thus, that NC Mutual's attempt to terminate the agreement pursuant to these extra-contractual quarterly goals was an anticipatory breach.

In response, NC Mutual argues that (1) the elements of anticipatory breach have not been met;[5] (2) NC Mutual's interpolation of the annual premium goals into quarterly goals was a reasonable contract interpretation; (3) even if not reasonable, the interpolation into quarterly goals was at most an immaterial breach of the Marketing Agreement; (4) Basic Medical's breach of contract claim is barred by equitable estoppel; and (5) any breach of the Marketing Agreement by NC Mutual was excused by the doctrine of mutual mistake. The Court will address each of these arguments in turn.

Repudiation is a positive statement by one party to the other party which indicates that the party will not or cannot substantially perform its contractual duties. *Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 510, 358 S.E.2d 566, 569 (1987). A party to a contract repudiates his obligation under a contract when he expresses, by words or

---

[5] NC Mutual also argues that the March 11th letter was not an anticipatory breach because NC Mutual possessed the right under the Marketing Agreement to withdraw the Product from the market and terminate the Marketing Agreement at any time and in its sole discretion. NC Mutual asserts that it would have withdrawn the Product if Basic Medical had challenged NC Mutual's right to send the March 11th letter. This argument fails. The Court will not adjudicate this matter on the basis of what NC Mutual might have done differently if it had the wisdom of hindsight.

conduct, a "positive, distinct, unequivocal and absolute refusal to perform." *Messer v. Laurel*

*Hill Assocs.*, 93 N.C. App. 439, 443, 378 S.E.2d 220, 223 (1989)(quoting *Edwards v.*

*Proctor*, 173 N.C. 41, 91 S.E. 584 (1917)); N.C. Pattern Jury Instr., Civil § 502.05 (2003).

When a party repudiates its obligations under a contract *before* the time for performance

under the contract, the repudiation becomes an anticipatory breach of the contract. *Id.*

    Defendant NC Mutual argues that its March 11th notice of termination cannot be an

anticipatory repudiation because it was not a "positive, distinct, unequivocal and absolute

refusal to perform." *See Messer*, 93 N.C. App. at 443, 378 S.E.2d at 223. NC Mutual points

out that its March 11th letter expressly conditioned termination of the Marketing Agreement

upon Basic Medical's ability or inability to make "appreciable progress" towards the 2002

premium sales requirement:

> [I]f your performance begins to approach targeted levels before June 1, 2002
> nothing could make us happier than to rescind this letter of termination . . . [I]f
> by the beginning of June we have had no appreciable progress toward the goal,
> we will stand on this notice at that time as an effective basis to terminate our
> relationship under the contract.

(Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. C.)

    The Court finds that the "conditional" nature of the March 11th notice of termination

does not shield it from constituting an anticipatory repudiation. The law in North Carolina

is well-settled that "if a party to the contract states that he cannot perform *except on some*

*condition which goes outside the terms of his contract* then the statement will constitute a

repudiation." *Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 511,

-13-

358 S.E.2d 566, 569 (1987)(emphasis added). In *Millis Constr. Co.*, the plaintiff was an independent contractor who was performing framing work on residences on the defendant's land pursuant to a series of contracts. *Id.* at 506, 358 S.E.2d at 567. During the course of construction, the plaintiff informed the defendant that he was "belly up" and "busted," and that he did not have enough money to complete the job. *Id.* at 507-08, 358 S.E.2d at 567. The plaintiff then asked the defendant to release the retainage for one of the buildings before it was due under the contract. *Id.* at 508, 358 S.E.2d at 567-68. The Court of Appeals held that because the plaintiff stated that he would not perform except on a condition (release of retainage before it was due) that went outside the terms of the contract, the trial court erred in not instructing the jury on the issue of anticipatory repudiation. *Id.* at 511, 358 S.E.2d at 569.

In this case, the Court finds that NC Mutual's "interpolation" of the annual premium sales requirements into quarterly requirements was an unreasonable contract interpretation and was not supported by the plain language of the Marketing Agreement. The critical language of the Marketing Agreement provides as follows:

> 3.2 As consideration for the fees being paid by NCM to BMCP hereinabove, BMCP shall provide to NCM at least the following minimum production amounts in the following *calendar years*: 2002, $1,000,000; 2003, $1,500,000; 2004, $2,000,000; and 2005, $2,500,000. After the year 2005, the minimum production target premium amounts shall be $3,000,000 *per year*. However, the amount received in excess of the minimum production premium as hereinabove scheduled shall be credited cumulatively forward to the following *years* for purposes of crediting minimum annual premium amounts. Notwithstanding

-14-

> the above, the target premium amount in any *year* after 2001
> must be $1,000,000 or more.

(Defs.' Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. B § 3.2)(emphasis

added). This language is clear and unambiguous – the premium sales requirements are based

on "calendar years" – and nothing in this section, nor any other section of the Marketing

Agreement, gave NC Mutual the right to "interpolate" these annual requirements into

quarterly requirements. The Court finds that NC Mutual's interpretation of section 3.2 was

unreasonable as a matter of law. *See Whirlpool Corp. v. Dailey Constr., Inc.*, 110 N.C. App.

468, 471, 429 S.E.2d 748, 751 (1993)("When the language of a contract is plain and

unambiguous then construction of the agreement is a matter of law for the court.") Because

NC Mutual's interpolation of the annual sales goals into quarterly goals was unreasonable,

it follows as a matter of law that NC Mutual did not have the right to demand reasonable

assurances of performance from Basic Medical based on these contrived, extra-contractual

sales requirements. Under the authority of *Millis Constr. Co.*, NC Mutual's extra-contractual

demands amounted to an anticipatory repudiation of the Marketing Agreement.

NC Mutual argues that *Millis Constr. Co.* does not provide authority for this Court to

grant summary judgment to Basic Medical on its breach of contract claim because the Court

of Appeals *at most* found that the plaintiff's statements made the issue of anticipatory

repudiation a jury question. This is an overly narrow reading of *Millis Constr. Co.* First, the

Court notes that the *Millis* court's holding was largely due to the procedural posture of the

case – the court was merely asked to rule whether the trial court erred by failing to instruct

-15-

the jury on the issue of anticipatory breach and was not asked to decide whether the defendant had established a claim of anticipatory breach as a matter of law. Second, the plaintiff's statement, "that if [the defendant] would agree to release the retainge on building number 7 which was 99% complete [the plaintiff] would have enough money to pay labor," at most *implied* that the plaintiff would not perform unless he received the undue retainage. The plaintiff's statement was not an express refusal to perform except on an extra-contractual condition, and thus, the Court of Appeals properly left the issue for the jury to decide.

In contrast, in this case, the March 11th notice of termination unequivocally states that NC Mutual will terminate the Marketing Agreement if Basic Medical has not made "appreciable progress" towards the $500,000 in premium sales required by June 1, 2002, *see* Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. C – a requirement which is clearly outside the terms of the Marketing Agreement. This places the March 11th notice of termination squarely within the doctrine of anticipatory repudiation. *See Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572 (7th Cir. 1976); *Westinghouse Elec. Corp. v. CX Processing Labs., Inc.*, 523 F.2d 668 (9th Cir. 1975); Restatement (2d) of Contracts § 250 cmt. b (1981); Unif. Commercial Code § 2-610 cmt. 2 (2004); 4 A. Corbin, *Contracts* § 973 at 910 (1951).

NC Mutual nevertheless contends that even if the Court should find that NC Mutual breached the Marketing Agreement, as it has, the breach was immaterial, and thus, Basic Medical did not have the right to declare the Marketing Agreement at an end. This

contention is without merit. The March 11th letter made it clear that NC Mutual expected Basic Medical's premium sales to "begin to approach targeted levels," i.e., $500,000, by June 1, 2002, or NC Mutual would terminate the Marketing Agreement effective June 1, 2002. (Defs.' Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. C.) The evidence before the Court is that Basic Medical had sold virtually no policies at the time of the March 11th letter. (Miller Dep. 167-68.) Thus, upon receiving this letter, Miller realized there was little chance of avoiding termination of the Marketing Agreement. (Miller Dep. (Def.) at 192-93, 196-98.) In addition, Miller believed that it would be unethical and futile to continue to attempt to recruit agents while under the cloud of probable termination. *See* Miller Aff. ¶ 6. Thus, the March 11th letter directly resulted in Basic Medical immediately ceasing all operations. The Court finds as a matter of law that NC Mutual's March 11th letter was a material breach of the Marketing Agreement.

NC Mutual contends that Basic Medical's breach of contract claim is barred by the doctrine of equitable estoppel. More specifically, NC Mutual claims that Basic Medical "***refused*** to contact (and refused to permit its attorneys to contact)" NC Mutual after receipt of the March 11th letter until specific performance of the Marketing Agreement was no longer possible, knowing that NC Mutual would interpret Basic Medical's silence as an acquiescence to the terms and conditions of the March 11th letter, and then brought this lawsuit claiming millions of dollars in lost profits. (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 15)(emphasis in original).

-17-

NC Mutual's argument is meritless. "Equitable estoppel arises when a 'party by acts, representations, admissions, or by silence . . . induces another to believe that certain facts exist, and such other person rightfully relies and acts upon that belief to his or her detriment.'" *State ex rel. Easley v. Rich Food Servs., Inc.*, 139 N.C. App. 691, 702, 535 S.E.2d 84, 91 (2000)(citation omitted). Contrary to NC Mutual's contention, Miller testified on deposition that he attempted to contact both Art Davis and Chuck Watts on at least two occasions following receipt of the March 11th letter, leaving messages each time that were not returned. (Miller Aff. ¶ 6; Miller Dep. (Def.) at 152, 188-89, 204; Miller Dep. Vol. II (Def.) at 28.) When he did not receive a response, Miller and his board of directors determined that any further attempts to resolve the problems between Basic Medical and NC Mutual would be futile. (Pl.'s Br. in Supp. of Mot. for Partial Summ. J., Ex. 25; Miller Dep. (Def.) at 192-93, 196-98.) In contrast, there is simply no evidence in the record of a plan or actions on the part of Basic Medical to deceive NC Mutual regarding its intentions following the March 11th letter. Basic Medical had no duty to respond to NC Mutual's anticipatory repudiation and material breach, and NC Mutual cannot manufacture one out of the doctrine of equitable estoppel.

NC Mutual finally argues that if it did breach the Marketing Agreement, its breach was excused by the doctrine of mutual mistake, i.e., that Basic Medical mistakenly interpreted the March 11th letter as an absolute renunciation of the Marketing Agreement. Again, the Court finds no merit to NC Mutual's argument. It is clear from NC Mutual's own

-18-

argument that the mistake alleged was not "mutual" but unilateral – according to NC Mutual's theory of the case, NC Mutual intended the March 11th letter to be a *conditional* notice of termination, and it was Basic Medical that misinterpreted the March 11th letter as an outright termination of the Marketing Agreement. The defense of mutual mistake fails as a matter of law.[6]

Both parties have also moved for summary judgment on NC Mutual's counterclaim for breach of contract. NC Mutual bases its counterclaim on Basic Medical's failure to provide NC Mutual with reasonable assurances of performance and its "unreasonable" decision to cease all operations upon receipt of the March 11th letter. However, as the Court has discussed above, NC Mutual did not have the right to request reasonable assurances of performance on the basis of extra-contractual requirements. *See Millis Constr. Co.,* 86 N.C. App. at 511, 358 S.E.2d at 569. It follows as a matter of law that Basic Medical's response (or lack of response) to the March 11th letter was not a breach of the Marketing Agreement, and NC Mutual's counterclaim for breach of contract must be dismissed.

---

[6] NC Mutual also argues that "insofar as BMCP contends that the Marketing Agreement limits or prohibits NCM from making a request for reasonable assurances as set forth in the March 11 letter, the Court should deem those parts of the Marketing Agreement . . . to be invalid for failure of the parties to reach a meeting of the minds, as the right to request reasonable assurances was an implied and understood material term of the agreement." (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 16.) The Court disagrees. The general right to request reasonable assurances is not challenged by Basic Medical. Rather, it is the "right" to request reasonable assurances based on "interpolated" quarterly sales requirements that is challenged, and the Court finds that this supposed "right" was not "an implied and understood material term of the agreement."

B.    The Unfair or Deceptive Trade Practices Claims

Basic Medical initially based its unfair or deceptive trade practices ("UDTP") claim on NC Mutual's alleged marketing of an insurance product (the "VMC policy") substantially similar to the Product at the approximate time that NC Mutual attempted to terminate the Marketing Agreement.  (Compl. ¶¶ 27, 35; Miller Dep. (Def.) at 237.)  In its brief in support of its motion for summary judgment on Basic Medical's UDTP claim, NC Mutual proffered evidence that the VMC policy was intended for sale to educational institutions in the State of Florida, was never approved for sale by the Florida Department of Insurance, and was abandoned by NC Mutual nine months before the March 11th letter was sent to Basic Medical.  (Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Exs. F, G; Ex. N, James N. Parrish Dep. (Def.) at 163-65, 170-71.)

In its brief in opposition to NC Mutual's motion for summary judgment, Basic Medical shifted its argument on its UDTP claim to the rather bald assertion that NC Mutual concocted an elaborate, four-part plan to terminate the Marketing Agreement by: (1) eliminating Parrish as NC Mutual's representative for the Product; (2) causing Charles Welch[7] to abandon his commitment to be Basic Medical's North Carolina State Manager; (3) ignoring or failing to cooperate with Miller by, among other things, denying knowledge of Miller's commitment to Vol-State from January to March 2002; and (4) seizing the

---

[7] Charles Welch had been the Senior Vice President for Agency Operations at NC Mutual prior to accepting the position of North Carolina State Manager with Basic Medical in September, 2001.  (Compl. ¶ 20, Ex. B.)

opportunity to terminate the Marketing Agreement while Miller was finishing up his work for Vol-State.

At the outset, the Court notes that Basic Medical's argument is based almost entirely upon speculation and appears to be a fanciful attempt to resuscitate its lifeless UDTP claim in the face of compelling evidence that Basic Medical's theories about the VMC policy were unfounded. Second, even if NC Mutual was contemplating terminating the Marketing Agreement, the Court notes that NC Mutual possessed the right to terminate the Agreement on a variety of grounds (as did Basic Medical), and that there is nothing inherently unfair or deceptive about a strategic business decision to terminate an agreement with another party.

The only apparent "wrongful" conduct by NC Mutual on the record before the Court is its "interpolation" of the annual premium sales requirements into quarterly requirements. However, under North Carolina law, "substantial aggravating circumstances" must accompany this breach of contract in order to give rise to an unfair or deceptive trade practice. *See Charlotte Commercial Group, Inc. v. Fleet Nat'l Bank*, No. 1:02CV00343, 2003 WL 1790882, at *3 (M.D.N.C. Mar. 13, 2003)(unpublished opinion)(Bullock, J.) The Court finds no such circumstances present here. The Court finds that Basic Medical's UDTP claim must be dismissed.

Similarly, the Court finds that NC Mutual's UDTP counterclaim is subject to dismissal. NC Mutual essentially argues that Basic Medical's decision to litigate this matter rather than making any "meaningful effort" to resolve the issues raised by the March 11th

notice of termination constitutes an unfair or deceptive trade practice. (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 18-19.)

NC Mutual's argument is foreclosed by the North Carolina Court of Appeals' decision in *Reichhold Chemicals, Inc. v. Goel*, 146 N.C. App. 137, 555 S.E.2d 281 (2001), *disc. rev. denied*, 356 N.C. 677, 577 S.E.2d 634 (2003). In *Reichhold Chemicals*, the employer filed a variety of claims against a former employee, including a claim misappropriation of trade secrets. *Id.* at 141-42, 555 S.E.2d at 284. To support its trade secrets claim, the employer obtained confidential documents from a competitor with whom the employee had a consulting agreement and filed a complaint with the Federal Bureau of Investigation ("FBI") regarding the alleged theft of its trade secrets. *Id.* at 143, 555 S.E.2d at 285. The documents and FBI investigation revealed that the employer's belief that the employee had misappropriated its trade secrets was unfounded. *Id.* Nevertheless, the employer terminated the employee and filed a lawsuit against the employee and the competitor. *Id.* at 144, 555 S.E.2d at 286. In response, the employee alleged numerous counterclaims, including a claim of unfair or deceptive trade practices. *Id.* at 141, 555 S.E. 2d at 284. The employee argued that his former employer's actions in filing the lawsuit, obtaining the competitor's documents, and filing a complaint with the FBI constituted unfair or deceptive trade practices. *Id.* at 156-57, 555 S.E. 2d at 293.

The *Reichhold Chemicals* court first held that the doctrines governing federal antitrust law announced in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S.

127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961) and *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993) applied to the North Carolina Unfair or Deceptive Trade Practices Act, N. C. Gen. Stat. § 75.1-1. 146 N.C. App. at 156, 555 S.E.2d at 293. Under *Noerr* and *Professional Real Estate Investors*, a plaintiff may not be held liable under federal antitrust law for bringing an "objectively reasonable" lawsuit, regardless of the plaintiff's subjective intent in bringing the suit. *Professional Real Estate Investors*, 508 U.S. at 57, 113 S. Ct. at 1928, 123 L. Ed. 2d at 621. "A lawsuit is objectively reasonable if 'an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome[.]'" *Reichhold Chemicals*, 146 N.C. App. at 157, 555 S.E.2d at 293 (quoting *Professional Real Estate Investors*, 508 U.S. at 60, 113 S. Ct. at 1928, 123 L. Ed. 2d at 624). Accordingly, the Court of Appeals held that even though the employer filed its lawsuit for "no legitimate purpose," the suit against the competitor was not "utterly baseless" and was therefore "objectively reasonable." 146 N.C. App. at 157, 555 S.E.2d at 293.

Applying *Reichhold Chemicals* to the case at bar, the Court finds without hesitation that Basic Medical's lawsuit is objectively reasonable, especially since the Court has found an actual breach of contract by Defendant NC Mutual. To the extent that NC Mutual argues that its UDTP claim is based not just on this lawsuit but on Basic Medical's entire "course of conduct" following receipt of the March 11th notice of termination, *see* Def.'s Br. in Opp'n

to Pl.'s Mot. for Partial Summ. J. at 18-19, the Court notes that *Reichhold Chemicals* once again forecloses this argument:

> [The employee] suggests that [the employer's] activities preceding the filing of its suit against [the competitor], including acquiring confidential [competitor] documents and filing a complaint with the FBI, constitute an unfair trade practice independent of the suit against [the competitor]. However, there is no indication that [the employer] undertook those acts for any trade related purpose other than preparation for the suit against [the competitor]. We hold that those actions alone are insufficient to qualify as unfair trade practices under N.C.G.S. § 75-1.1

146 N.C. App. at 157, 555 S.E.2d at 293. Similarly, here, there is no indication that Basic Medical's actions following receipt of the March 11th notice of termination were for a "trade related purpose." Rather, it is apparent that Basic Medical was preparing for its lawsuit against NC Mutual. NC Mutual's counterclaim for unfair or deceptive trade practices must be dismissed.

C.    The Abuse of Process Claim

In its third counterclaim against Basic Medical, NC Mutual once again argues that Basic Medical's decision to litigate this matter rather than to resolve the issues raised by the March 11th notice of termination constitutes an "abuse of process."

The Court finds this counterclaim to be baseless. To establish a claim of abuse of process, NC Mutual must show that (1) a proceeding was initiated against it by Basic Medical or used by Basic Medical to achieve an ulterior purpose; and (2) once the proceeding was initiated, Basic Medical committed some willful act not proper in the regular prosecution of the proceeding. *Semones v. Southern Bell Tel. & Tel. Co.*, 106 N.C. App. 334, 341, 416

-24-

S.E.2d 909, 913 (1992). Because NC Mutual has made no attempt to show a willful or improper act by Basic Medical *subsequent* to the filing of this action, NC Mutual's counterclaim for abuse of process must be dismissed. *See Edwards v. Advo Sys., Inc.*, 93 N.C. App. 154, 376 S.E.2d 765 (1989)(summary judgment affirmed for defendant where plaintiff's allegations dealt only with defendant's motives in *filing* the suit, rather than any abuse of the judicial system *after* the institution of the lawsuit).

D.  Loss of Profit Damages

NC Mutual moves for summary judgment on the issue of Basic Medical's damages on the grounds that Basic Medical's only claimed damages are lost profits, and that Basic Medical's proffered evidence to support these highly speculative damages is insufficient as a matter of law, citing *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 356 S.E.2d 578 (1987). Accordingly, NC Mutual urges the Court to limit Basic Medical's recovery to nominal damages. Basic Medical responds that its three experts have sufficiently described its lost profit damages with "reasonable certainty," as required by North Carolina law.

After consideration of all of the relevant evidence, the Court concludes that Basic Medical's evidence of lost profits is too speculative to support a verdict and fails the "reasonable certainty" test as a matter of law. The starting point in the Court's analysis is the *Olivetti* decision of the North Carolina Supreme Court. In *Olivetti*, the Court declined to adopt the "new business rule," a *per se* rule which would preclude lost profit damages for a new business with no established history of profitability. *Id.* at 546, 356 S.E.2d at 585.

-25-

However, the Court recognized that "lost future profits are difficult for a new business to calculate and prove," and adopted the "well-established principle of law that proof of damages [of lost profits] must be made with reasonable certainty." *Id.* (citing *Weyerhaeuser Co. v. Godwin Bldg. Supply Co., Inc.*, 292 N.C. 557, 234 S.E.2d 605 (1977)).

Basic Medical has produced three expert reports in support of its claim for lost profits, none of which, either individually or cumulatively, meets the "reasonable certainty" standard. Plaintiff's first expert, Jay D. Wink, III, has been an insurance broker providing voluntary benefits and enrollment services to employers since 1988. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. and Partial Summ. J., Ex. 29.) In his expert report, Wink opined that "Basic Medical Care was established to address a significant need in the market place" and that "Mr. Miller's previous experience enabled him to establish a sound sales strategy." *Id.* At most, this statement by Wink is a vague prediction that the Product might be profitable. However, Wink's opinion fails to address *how much* profit Basic Medical would have earned but for NC Mutual's breach, which is the critical damage issue in this case. In fact, Wink admitted that he lacked the ability to make any projections about what Basic Medical's actual sales would have been. (Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. R, Jay D. Wink, III Dep. at 110-15.)("I have no intention of going out and swagging some numbers.")

Plaintiff's second expert fares no better. Donald L. Larson is a Regional Sales Coordinator for AFLAC and has been with the company since December 1973. In his expert report, Larson opined as follows:

> The Basic Medical Care Plus is a product that employers and their employees are asking for. I believe that a Basic Medical Care Plus sales person calling on the small business employer market *as we did with the cancer insurance product in the middle and late nineteen-seventies* could very conservatively establish the equivalent of twenty 15 employee new accounts in his/her first twelve months in the field. I believe that it would be realistic to project that each of those twenty new accounts would generate a minimum of $10,000 in new annualize[d] premium or $200,000 in total new annualized premium.
>
> 15 employees X $700.00 Annualized Premium = $10,500 per new account
>
> 20 new accounts X $10,500 = $210,000

(Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. and Partial Summ. J., Ex. 34)(emphasis added). The fundamental problem with Larson's opinion is that Larson relied on his experience with AFLAC *30 years ago* to predict what Basic Medical would be able to achieve in 2002 and beyond. Under North Carolina caselaw, this is wholly insufficient to support a claim for lost profits. *McNamara v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400, 409, 466 S.E.2d 324, 330 (1996)(expert's testimony "too conjectural to support an award of lost profits" for small custom jewelry store where based on data from independent national jewelers); *see also Olivetti*, 319 N.C. at 548-49, 356 S.E.2d at 587. Furthermore, even if valid, Larson's opinion presents only one piece of the overall puzzle – Larson has opined about how many policies *one* Basic Medical sales person could sell. Missing from

his opinion is (1) how many agents Basic Medical could hire and retain at any given time; and (2) any attempt to tie the predicted profits to calendar years. Finally, Larson admitted in his deposition that his projections were a "layman's estimate," and not based on any scientific or market data. (Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. S, Don Larson Dep. at 43-47.)

Plaintiff's third expert, Christopher J. Ruhm, is the Jefferson-Pilot Excellence Professor of Economics at University of North Carolina at Greensboro. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. and Partial Summ. J., Ex. 31.) In his expert report, Ruhm provided damages calculations for Basic Medical based upon two different "scenarios" or sets of assumptions. According to Ruhm, Basic Medical's lost profits were $3,873,673 under the first scenario and $1,178,468 under the second scenario. *Id.*

The Court finds that Ruhm's report is insufficient to support Basic Medical's claim for lost profits. In his expert report, Ruhm states, "In forming my opinions, I have reviewed the Plaintiff's responses to the defendant's first set of interrogatories and the *additional information sent via electronic mail from [Defendant's counsel]*." *Id.* First, the Court cannot evaluate the validity of Ruhm's opinions when one of the bases of his opinions is unidentified – the Court does not know what "additional information" Ruhm reviewed to form his opinions. Second, the other source on which Ruhm based his opinions was Basic Medical's own sales projections, which Miller admits were optimistic, unscientific estimates made at the time Basic Medical was formed. (Miller Dep. (Def.) at 136-38, 142-51.) The

-28-

North Carolina courts have not allowed claims for lost profits where the expert's opinion is based solely on the claimant's own speculative business plan and not based on any independent research or data or any comparison to similar businesses. *See Old Well Water, Inc. v. Collegiate Distr., Inc.*, No. COA01-981, 2002 WL 1315395 (N.C. App. June 18, 2002)(unpublished opinion); *Iron Steamer, Ltd. v. Trinity Rest., Inc.*, 110 N.C. App. 843, 431 S.E.2d 767 (1993).  Furthermore, Ruhm admitted in his deposition that he could not have created sales projections of his own without first conducting comprehensive market research, which Basic Medical did not ask him to do.  (Def.'s Br. in Supp. of Mot. for Summ. J. and for Partial Summ. J., Ex. T, Christopher John Ruhm Dep. at 26-36.)

Because the Court has found that Plaintiff Basic Medical is entitled to summary judgment on its breach of contract claim, but now finds that Plaintiff Basic Medical's proffered evidence in support of its claims for lost profits (the only form of damages it seeks) is insufficient as a matter of law, the Court concludes that Basic Medical's recovery in this case must be limited to nominal damages.[8]  *Robbins v. C.W. Myers Trading Post, Inc.,* 251 N.C. 663, 666, 111 S.E.2d 884, 886-87 (1960)("'Where plaintiff proves breach of contract he is entitled at least to nominal damages.'"); *Catoe v. Helms Constr. & Concrete Co.*, 91 N.C. App. 492, 496-97, 372 S.E.2d 331, 335 (1988)("When a *prima facie* case of breach of

_____

[8] Because of the Court's holding limiting Basic Medical to nominal damages, the Court need not and does not reach NC Mutual's argument that Basic Medical failed to mitigate its damages.  It is worth noting, however, that the evidence is uncontroverted that Basic Medical took no steps to mitigate damages, and its failure to mitigate would be a great obstacle to any substantial recovery by Basic Medical under any theory of lost profits.

contract is made out, but there is no evidence upon which a jury could base a damage award, the injured party is still entitled to nominal damages for invasion of his legal rights."); *Cole v. Sorie,* 41 N.C. App. 485, 490, 255 S.E.2d 271, 274 (1979); *Gouger & Veno, Inc. v. Diamondhead Corp.,* 29 N.C. App. 366, 369, 224 S.E.2d 278, 280 (1976) .

## V. Conclusion

For the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiff Basic Medical's motion for partial summary judgment (Pleading No. 25) be **GRANTED** on its claim of breach of contract, and that NC Mutual be ordered to pay Basic Medical nominal damages of $1.00. **IT IS FURTHER ORDERED** that Basic Medical's motion for summary judgment (Pleading No. 25) on NC Mutual's counterclaims of breach of contract, unfair or deceptive trade practices and abuse of process be **GRANTED**, and that these counterclaims be dismissed with prejudice.

**IT IS FURTHER ORDERED** that Defendant NC Mutual's motion for partial summary judgment (Pleading No. 23) on its counterclaims for breach of contract and unfair or deceptive trade practices be **DENIED**. **IT IS FURTHER ORDERED** that NC Mutual's motion for summary judgment (Pleading No. 23) on Basic Medical's unfair or deceptive trade practices claim be **GRANTED**, and that this claim be dismissed with prejudice; and

that NC Mutual's motion for summary judgment (Pleading No. 23) on Basic Medical's breach of contract claim be **DENIED**.

A separate judgment will be entered this day.


<u>                    /s/ P. Trevor Sharp                    </u>
United States Magistrate Judge



Date:  September 6, 2005